# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN R. GALE,

     *Plaintiff*,
     v.

CITY OF BRIDGEPORT,

     *Defendant*.

No. 3:19-cv-00631 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff, Lieutenant John Gale, a Caucasian police officer, brings racial discrimination and retaliation claims against Defendant, the City of Bridgeport (the "City"), under Title VII and Conn. Gen. Stat. §§ 46(a)-60(b)(1), (b)(4).  Gale claims that Lieutenant Jeffrey Grice, an Afircan-American and the Commander of the Bridgeport Police Academy, terminated him from his teaching position at the Academy on account of his race.  As a result of this termination, Gale filed a racial discrimination complaint with the Commission on Human Rights and Opportunities ("CHRO") on June 6, 2017.  Captain Rebeca Garcia replaced Lieutenant Grice as the Commander of the Academy in late August 2017.  Gale claims that Captain Garcia retaliated against him on account of his CHRO complaint by (1) refusing to consider him for instructor positions at the Academy, (2) terminating him from his teaching position at the Firearms Training Unit, and (3) seeking to discipline him for allegedly violating a Bridgeport Police Department rule.  The City moves for summary judgment on all of Gale's claims.  For the reasons below, I grant in part and deny in part the motion for summary judgment.

### II.    FACTS

1

The following facts are taken from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

### A. Gale's Employment with Bridgeport Police Department

Lieutenant John Gale, who is Caucasian, has worked at the Bridgeport Police Department ("BPD") since his hiring in 2000.  ECF No. 33, Material Facts Asserted by Defendant ("Material") ¶ 1, 16.  He "was promoted to Sergeant in 2010 and was promoted to Lieutenant in 2016."  *Id.* ¶ 2.  Since joining the BPD, Gale has worked with Lieutenant Jeffrey Grice.  *Id.* ¶ 3.

In March 2010, Gale "started teaching, for extra compensation, various courses to police officers and recruits at the [] Bridgeport Police Training Academy ('Academy')" in addition to his regular police duties.  *Id.*, Additional Material Facts ("Additional") ¶¶ 3, 5; ECF No. 33-3 ¶ 8.  Gale is certified by the "Police Officer Standards and Training Council ("POSTC")" to instruct in seventeen areas of law and police procedure."  ECF No. 33, Additional ¶ 4; ECF No. 33-3 ¶ 7.  POSTC requires that applicants for renewal of certifications must have "taught at least one class per year in each area in which they have held law enforcement instructor certification."  ECF No. 33-7 at 4.

Gale also was a member of the Firearms Training Unit ("FTU") and served as "a firearms instructor since 2010."  ECF No. 33, Additional ¶ 38.  The City alleges that the FTU is part of the BPD's Emergency Services Unit ("ESU"), while Gale claims that the FTU "is its own division under [Deputy Chief ('D/C')] Anthony Armeno outside of Training and ESU."  ECF No. 33, Material ¶ 76.

### B. Grice's Tenure as Academy Commander

In December 2015, Grice was assigned as the Commander of the Academy.  *Id.* ¶ 19.  As Commander, Grice states that his responsibilities were to "prepare subject lesson plans, [] assign

instructors to teach the new class of recruits," and "control cost." *Id.* ¶¶ 21, 26. Gale disputes this and alleges that the Commander oversees the lesson plans completed by the instructors, *id.* ¶ 21, and in Gale's experience, higher ranking positions, such as Captains, Deputy Chiefs, and Chief, are "tasked with budget responsibility," not Lieutenants, ECF No. 33-3 ¶¶ 17, 18; ECF No. 33, Material ¶ 26.

Grice states that the "general practice" is for police instructors to teach their classes "in lieu of the normal work-day assignment[s]" as officers. ECF No. 24-3 at 58 ¶ 17; ECF No. 33, Material ¶ 33. Gale disputes this, claiming that the if "an instructor was scheduled to teach on a day that was normal work-day assignment, … then the officer would be required to take a schedule adjustment[](S/A)." *Id.* BPD only paid instructors overtime when they taught on their days off. *Id.*; ECF No. 33, Additional ¶ 29. In addition, it is "cheaper for the [Academy] to use officers from other police departments, because … they are not paid by the [BPD] and they do not put in for overtime."[1] ECF No. 33, Material ¶ 55.

When Grice was assigned as Commander of the Academy, the next class of police recruits, Class 37, was scheduled to start in February 2016. ECF No. 33, Material ¶ 20. For Class 37, "Sergeant Billy Simpson was assigned to make the [teaching] schedule." *Id.* ¶ 22; ECF No. 24-3 at 67 ¶ 7. Grice states that he thought Gale would teach DUI Investigation as he had in the past but not Accident Investigation or Motor Vehicle Law because the standards had recently changed, and Corporal Brian Norko of the Stratford Police Department, who is Caucasian, usually taught those classes at no cost to the City. ECF No. 33, Material ¶¶ 24, 25, 45. When Grice called Corporal Norko, "he was informed that Corporal Norko could not teach the class."

---

[1] Gale denies this but does not cite evidence to the contrary. ECF No. 33, Material ¶ 55. He does cite evidence for his denial that the financial concern was the main reason that Grice stopped using him as an instructor. *Id.*

*Id.* ¶ 27.  Because Corporal Norko could not teach, Grice assigned Gale to teach Accident

Investigation, DUI, and Motor Vehicle Law.  *Id.* ¶ 29.  Gale disputes this and states that Sergeant

Simpson assigned him to teach "Motor Vehicle Law, Accident Investigations, and DUI, for

which he was POST certified to teach."  *Id.* ¶ 24.  Further, because Sergeant Simpson was

responsible for scheduling, Gale claims that Grice would not have called Corporal Norko.  *Id.* ¶

27.

　　"[Gale] worked the midnight shift as his police officer assignment" and as a result, he

was paid overtime when he taught during the day.  ECF No. 33, Material ¶¶ 34, 35.  Gale states

that "[i]t has always been the instructor's option to teach after working his or her regular police

officer assignment unless the hours conflicted with normal assigned duties, then the S/A would

have to be used."  *Id.* ¶ 34.  Grice told Gale that he needed to adjust his schedule because he

would not be paid overtime every time he taught.  *Id.* ¶ 35.  Grice alleges that Gale balked at the

prospect of not being paid overtime for every time, *id.* ¶ 36, and "refused to make schedule

adjustments," *id.* ¶ 51.  Gale denies this and alleges that he offered to take schedule adjustments

instead of being paid overtime because he found teaching "enjoyable and self-rewarding."  *Id.*;

ECF No. 33-3 ¶¶ 40, 41.   From 2015 to 2020, Gale made a total of $375,792.11 in overtime:

$50,453.10 in 2015, $59,298.07 in 2016, $43, 861.36 in 2017, $70,323.90 in 2018, $96, 953.39

in 2019, and $54, 902.30 in 2020.  ECF No. 33, Material ¶ 18.

　　In March 2016, Grice was informed that new recruit Class 38 was scheduled to start in

August 2016.  ECF No. 33, Material ¶ 37.  Grice left multiple messages for Corporal Norko to

determine if he would be interested in teaching this new class but never heard back.  *Id.* ¶ 39.

Based on subsequent conversations with Captain Budd from the Stratford Police Department and

Corporal Norko himself, Grice believed that Gale had called Corporal Norko to inform him that

4

Lieutenant Grice did not like his instruction of recruits.  *Id.* ¶ 40–44.  Gale denies that he told Corporal Norko that Grice was unhappy with his instruction, ECF No. 33-3 ¶ 30, and alleges that he had contacted Corporal Norko to ask if he would be willing to assist in teaching a class for Class 37, ECF No. 33-3 ¶ 26.

 In November 2016, Grice decided to use Officer Kevin Geraci from the South Windsor Police Department to teach DUI for Class 38.  ECF No. 33, Material ¶¶ 46, 49.  Grice also decided to use a retired officer from the Windsor Police Department, Chuck Grasso, and an officer from the Vernon Police Department, Kevin Slater, to teach Accident Investigation.  *Id.* ¶¶ 48–49.  All three officers are Caucasian.  *Id.* ¶¶ 46, 48.

Gale was informed that Grice decided not to use him as an instructor for Class 38.[2]  *Id.*, Additional ¶ 6; *see also* ECF No. 24-3 at 59 ¶ 34.  Grice explained to Gale that he "had qualified instructors … who were willing to work for free" but Gale could still "provide 'in service' training to regular members of the [BPD]."  *Id.*; ECF No. 33, Material ¶ 50.  On December 9, 2016, Grice sent a memo to Chief Armeno Perez and Deputy Chief James Baraja writing that when Gale asked why he was not on the schedule to teach, Grice informed him that he "was aware of [Gale's] unauthorized contact with Corporal Norko and other instructors[,] … [and] that his inappropriate contact offended Corporal Norko who no longer wanted to teach [at the Academy]."  ECF No. 33-1 at 6.  In a subsequent email, Gale denied any improper contact with the other instructors.  *Id.* at 3–4.  In response, on January 12, 2017, Deputy Chief Baraja emailed

---

[2] It is not clear when Grice "terminated" Gale's position as an instructor at the Academy.  Gale claims that "[o]n or about December 8, 2016," he was informed that Grice had decided not to use him as an instructor.  ECF No. 33, Additional ¶ 6.  Grice claims that Gale approached him in November 2016 regarding his decision to not use him as an instructor for Class 38.  ECF No. 33, Material ¶ 50.  In Gale's 2017 CHRO complaint, he alleged that "[o]n or about May 17, 2017, [he] was informed that Commander Grice would not allow [him] to teach again at the Academy, and [Grice] was going to use instructors from other police departments to teach courses that [he] taught in the past."  ECF No. 24-3 at 106.

Grice and Gail, "encourag[ing] Lt. Grice to make use of Lt. Gale for in-service opportunities,"
and concluding that nothing in the record at that time suggested that Gale was facing discipline.
ECF No. 33-2 at 2.  On March 21, 2017, Gale emailed Captain Douglas Stolze stating that "D/C
Baraja failed to properly address this [issue]."  ECF No. 33-1 at 3.

Grice claims that he asked Gale to conduct in-service training at the Academy from May
15, 2017 to May 18, 2017 and to teach "traffic control & direction" to Class 38 in June 2017.
ECF No. 33, Material ¶ 52.  However, Gale alleges that Grice only asked him to teach in-service
after Captain Stolze questioned Grice as to why "he wasn't using [Gale]."  ECF No. 33-8 at 6;
ECF No. 33, Material ¶ 52.

On June 6, 2017, Gale filed a complaint with the CHRO alleging that Grice "[would] not
allow [him] to teach at the Academy because of [his] race and color."[3]  ECF No. 24-3 at 106.  In
his deposition, Gale testified that he believed that Grice had discriminated against him based on
his color or race because:

 a. Grice believed that Gale was being racist because of the assignments he was
  giving some black female officers when preparing rosters;
 b. Grice would supposedly tell Gale's then boss, Captain Blackwell, that Gale was
  Blackwell's "boy";
 c. Grice assigned Sergeant Duharte, who is a black male, "the Road," but assigned
  Gale "Booking," which Gale considered less desirable;
 d. Grice told Gale to take scheduled adjustments so Grice could avoid paying him
  overtime;
 e. Grice made Gale pay out of his own pocket for "certain supplies" that he brought
  with him to teach his DUI class;
 f. Sergeant Eric Schneider allegedly told Gale that Lieutenant Grice "doesn't want
  to use you";
 g. Grice supposedly keeps Black Lives Matter and Nation of Islam flags in his
  office, or so Gale had been told by Sergeant Schneider;
 h. Gale scored very close to Lieutenant Grice on the Lieutenant's test; and

---

[3] Neither party submitted a copy of the 2017 CHRO complaint.  The quoted excerpt is taken from Gale's
2018 CHRO complaint, which described his 2017 complaint.  The City submitted Exhibit J, which is labeled as the
6/7/2017 CHRO complaint but is actually a copy of the 2018 complaint.  ECF No. 24-3 at 139–162.

　　　i.　Gale felt that Grice was threatened by him because he supposedly has more academy training experience than Grice.

ECF No. 33, Material ¶¶ 8–16.

## C. Garcia's Tenure as Academy Commander

In August 2017, "Captain Rebeca Garcia replaced Lieutenant Grice as the Commander of the Police Academy." ECF No. 33, Material ¶ 56. On August 24, 2017, Gale sent Captain Garcia a "high importance" email congratulating her on her new role. *Id.* ¶ 57; *see* ECF No. 24-3 at 127. In the email, Gale makes Captain Garcia aware of his CHRO complaint against Grice and states that with her "OIA expertise and experience … [he is] hoping that [she] can resolve this in an expedited manner." ECF No. 33, Material ¶ 58. Gale further states that "[t]he academy needs to be cleaned up" and "[m]ost if not all the staff [at the academy] are not happy and Grice has alienated them [] with his preferential treatment." *Id.* Captain Garcia states that she "knew nothing of the circumstances that may have existed between Lieutenant Grice and Lieutenant Gale, and it was not for [her] to resolve [his CHRO] claims in an expedited manner." ECF No. 24-3 at 135; ECF No. 33, Material ¶ 61. Captain Garcia also states that she "was unimpressed and put-off by Gale's behavior from the start," that Gale attempted to "leverage his position and manipulate [her]" even before she started at the Academy, and that she "found his actions unprofessional and disconcerting."[4] ECF No. 24-3 at 135; ECF No. 33, Material ¶ 59. Gale denies Captain Garcia's characterization of the August 24th email and argues that he was asking Captain Garcia to assign him to teach courses, not to resolve the CHRO complaint. *Id.*

---

[4] Gale argues that this statement from the affidavit should be disregarded because it "conflicts" with Garcia's deposition. ECF No. 33, Material ¶ 59. According to Gale, "Garcia never asserted or implied" that Gale attempted to leverage his position or manipulate her in her deposition. *Id.* Gale fails to point, however, to any specific conflict between Garcia's affidavit and her deposition testimony.

Captain Garcia claims that Gale confronted her at the department's gas pump to ask if she received his email.  *Id.* ¶ 65.  Gale denies this happened and states that Garcia never raised this issue in response to his 2018 CHRO complaint.  *Id.*; *see* ECF No. 33-5.  Captain Garcia states that "[she] felt Lieutenant Gale would not be a good fit on [her] staff based on the unprofessional tenor of his August 24 email, and [her] interaction with him at the gas pump only reinforced that belief."[5]  ECF No. 24-3 at 136; ECF No. 33, Material ¶ 66.  Garcia also testified that "[Gale] came into [her] office, pretty much unannounced … [and] he was talking about some of his certifications."  ECF No. 33-9 at 6; ECF No. 33, Material ¶ 67.  Garcia asked him to send her a list of his certifications.  *Id.*

On September 12, 2016, Gale sent another email to Captain Garcia stating: "Captain, now that you are getting settled in, I was hoping to address you further and specifically asking to get my classes back that I was unjustly cut from. Let me know. Thank you."  ECF No. 33-4 at 3; ECF No. 33, Material ¶ 68.  In response, Captain Garcia wrote: "Being that this matter is currently going through the CHRO process and being handled by the City Attorneys' Office (Attorney Bohanon), I am not at liberty to speak about this matter at this time."  ECF No. 33-4 at 2.  Gale responded and wrote: "That was against Grice … I don't expect you to speak on the matter, I was hoping you could just let me return to what I do, and have done, for the last 7+ years."  *Id.*  In explaining her response, Captain Garcia states that she remembered "Gale referencing his CHRO complaint and expressing his hope that [she] would 'resolve this in an expedited manner' [and] [n]ow, he wanted to address the matter with [her] further, 'specifically

---

[5] Gale denies Garcia's averments but submits no evidence to the contrary.  ECF No. 33, Material ¶ 66.  He argues that this was a "sham excuse" that was "never raised previously to filing this motion."  *Id.*  Further, Gale argues that there are no contemporaneous records corroborating her averments.  *Id.*  Gale also states that Garcia never asserted that she felt that way about Gale in her affidavit in response to the 2018 CHRO complaint.  *Id.*; *see* ECF No. 33-5.

asking to get [his] classes back that [he] was unjustly cut from.'"  ECF No. 24-3 at 136; ECF No.

33, Material ¶ 69.  Based on this Garcia believed that "Gale was not asking to speak to [her]

about training assignments; he wanted to discuss his alleged 'unjust' treatment and get back

whatever he claimed to have lost."  ECF No. 24-3 at 136; ECF No. 33, Material ¶ 69.  Gale

argues that his only interest was to get his teaching job back, not to discuss the CHRO complaint.

*Id.*  Gale did not teach any classes while Captain Garcia was Commander of the Academy.  ECF

No. 33-9 at 2.

### D.  Termination of Gale from FTU Instructor Position

On April 26, 2018, "Officer Pedro Garcia, the brother of Captain Garcia, informed [Gale]

that he could no longer work as a firearms instructor."  ECF No. 33, Additional ¶ 45.  Captain

Garcia testified that Deputy Chief Armeno, the overseer of the FTU, instructed her to tell Officer

Garcia not to use Gale as an instructor at the FTU.  ECF No. 33, Material ¶ 81; ECF No. 24-3 at

72.  Captain Garcia also testified that Gale was no longer a FTU instructor because of his

"negative attitude" and because of Departmental "financial concerns."  *Id.* ¶ 82.  Gale disputes

Captain Garcia's justifications.  First, he points to her deposition where Captain Garcia could not

identify a specific reason that Deputy Chief Armeno cited for deciding not to use Gale as an

instructor.  ECF No. 33-9 at 13; ECF No. 33, Material ¶ 82.  Second, while "[p]ersonnel from

other police departments were used as instructors on the firearms range[] at no cost to the

Department," ECF No. 33, Material ¶ 83, Gale states that the BPD "continued to use members

from the ESU" as instructors, ECF No. 33-3 at 7.

### E.  Captain Garcia's Disciplinary Actions Against Gale

"On February 21, 2018[,] Bridgeport's Police Chief issued a Specialized Training

Directive" stating that "all training notifications are to be referred to the Training Academy

Commander – Captain Rebeca Garcia" and "[i]f an officer is interested in being considered for specific training, he/she shall submit a completed" form.  ECF No. 33, Material ¶ 84.  According to the Directive, no officer "is to submit his or herself for" a training class with an outside agency without completing the requirements.  *Id.*  On March 5, 2018, Gale submitted a training request form for "Taser Instructor Recertification" to be given at the Academy by Axon Taser.  *Id.* ¶ 85.  Captain Garcia denied Gale's request because the class was already at capacity.  *Id.* ¶ 86.  Gale then emailed Captain Garcia stating that in the "past Taser has had latitude with the host agency for attendees, but if that's not possible" to let him know when the next class would be because his Taser certification was set to expire in May 2018.  *Id.* ¶ 87.  On April 1, 2018, Gale emailed Axon Taser directly to ask if Axon would "allow the latitude to add one more attendee to recertify."  *Id.* ¶ 89.   Axon responded that the class was at maximum capacity.  *Id.* ¶ 91.

On April 3, 2018, Captain Garcia emailed Gale stating that she had a copy of Axon's email to him and that "it appeared he [had] contacted Axon directly about attending the May training class, even though she [had] previously advised him" the class was full.  *Id.* ¶ 92. Deputy Chief Armeno "concur[red]" with Captain Garcia's email because the Chief's February 21, 2018 Directive had indicated that "ALL training notifications and interest [were] to be referred to" Captain Garcia.  *Id.* ¶ 93.  On April 27, 2018, Captain Garcia emailed Gale asking him to "write an explanatory report" concerning "[his] reaching out to [the] Taser company via email."  *Id.* ¶ 94.  Gale notes that this request for an explanatory report occurred over three weeks after the incident and only a day after Officer Garcia informed him that he would no longer be an instructor at the FTU.  *Id.*  Gale responded, stating: "That was meant to be a hypothetical question. I'll get you that soon."  *Id.* ¶ 95.

On May 11, 2018, Captain Garcia filed a personnel complaint ("PC-1") against Gale for failing to follow the Specialized Training Directive.  *Id.* ¶ 97.  In the PC-1, Captain Garcia recommended that "Gale not be utilized within a training capacity for a minimum of six months from date decision is rendered."  ECF No. 24-3 at 77.  According to Gale, Bridgeport's Office of Labor Relations concluded that Captain Garcia's April 3, 2018 email "included an admonishment – or counseling – and that further disciplinary action against [Gale] would constitute double jeopardy."  ECF No. 33, Material ¶ 105; *see* ECF No. 33-8 at 42–44.

Gale filed a CHRO complaint concerning retaliation on June 7, 2018, claiming that the City retaliated against him for filing his earlier complaint alleging race discrimination.  ECF No. 33, Material ¶ 98.

### III.    PROCEDURAL HISTORY

Gale filed suit against the City on April 29, 2019, alleging claims of unlawful discrimination in violation of Title VII and Conn. Gen. Stat. § 46a-60(b)(1) and unlawful retaliation in violation of Title VII and Conn. Gen. Stat. §§ 46a-60(b)(4).   On November 18, 2020, the City moved for summary judgment as to all counts in the complaint.

### IV.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the

evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable

jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d

Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to

any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party

carries its burden, "the opposing party must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358

(2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## V.    DISCUSSION

### A.  Racial Discrimination Under Title VII and Conn. Gen. Stat. § 46a-60(b)(1)

Gale claims that Grice discriminated against him based on his race when Grice

terminated him as an instructor at the Academy, in violation of Title VII and Conn. Gen. Stat. §

46a-60(b)(1).[6]   ECF No. 34 at 1–2; ECF No. 1 at 11, 15.  Title VII of the Civil Rights Act of

1964 prohibits employers from discriminating against their employees on the basis of race.  42

U.S.C.§ 2000e–2(a)(1). Title VII claims follow the *McDonnell Douglas* burden-shifting

framework.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see McDonnell Douglas

Corp. v. Green*, 411 U.S. 792 (1973).  First the employee "bears the initial burden of establishing

a *prima facie* case of discrimination" by showing: "(1) that he belonged to a protected class; (2)

that he was qualified for the position he held; (3) that he suffered an adverse employment action;

and (4) that the adverse employment action occurred under circumstances giving rise to an

inference of discriminatory intent."  *Id.*  "The burden a plaintiff, alleging that he was

---

[6] I will analyze the Connecticut state law claims together with the federal Title VII claims as the legal standards are the same.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2010) ("The analysis of discrimination and retaliation claims under [the Connecticut Fair Employment Practices Act ("CFEPA")] is the same as under Title VII."); *Soares v. Altice Tech. Servs. US, LLC*, No. 19-1975, 2021 WL 3475704, at *2 ("Claims brought under CFEPA are analyzed under the *McDonnell-Douglas* burden shifting framework used in Title VII.").

discriminated against by his employer, carries to survive a summary judgment motion at the prima facie stage is a minimal one." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d. Cir. 2000). If the employee establishes a prima facie case, the burden then shifts to the employer to provide a "legitimate, non-discriminatory reason" for its action. *Id.* If the employer is able to provide such a reason, then the employee must demonstrate "that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The City argues that Gale's race discrimination claim fails because he cannot establish a *prima facie* case of discrimination. Specifically, the City argues that Gale fails to show either an adverse employment action or circumstances giving rise to an inference of discriminatory intent. ECF No. 24-1 at 8–9. The City does not contest that Gale is a member of a protected class and that he is qualified. *See Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 259 n.9 (E.D.N.Y. 2005) (finding that a "white" plaintiff is part of a protected class and noting that courts in the Second Circuit have disagreed as to whether a white plaintiff "faces a heightened burden in establishing a prima facie case of 'reverse discrimination'").

1. <u>Adverse Employment Action</u>

The City argues that Gale has failed to show an adverse employment action because he "continued to teach 'in service' classes at the Police Academy," "collected significant overtime dollars as a Bridgeport police officer" from 2017 to 2020, and suffered no demotion or diminishment of responsibilities. ECF No. 24-1 at 9. Gale argues that he has shown adverse employment because his removal from the instructor positions "derail[ed] [his] avocation as an instructor [and] it deprived him of the overtime opportunities, which inured to the benefit of those police instructors, who have achieved the required certificate." ECF No. 34 at 27.

13

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks omitted).  "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks and citation omitted).  "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices … unique to a particular situation."  *Id.* (internal quotation marks and citation omitted).  "But a bruised ego, a demotion without change in pay, benefits or duties, or prestige, or reassignment to [a] more inconvenient job are all insufficient to constitute a tangible or materially adverse employment action."  *Gilani v. Teneo, Inc.*, No. 20-1785, 2021 WL 3501330, at *19 (S.D.N.Y. Aug. 4, 2021) (internal quotation marks and citation omitted).  "Mere inconveniences like these do not constitute adverse employment actions unless they are accompanied by some attendant negative result, such as a deprivation of a position or opportunity."  *Id.* (internal quotation marks and citation omitted).

Here, Gale has shown adverse employment action.  It is true that Gale continued to collect "significant overtime dollars as a Bridgeport police officer" from 2017 to 2020, and in fact, made more in overtime in 2018 and 2019 than he did when he was still teaching.  *See* ECF No. 33, Material ¶ 18; *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 449 (S.D.N.Y. 2002) (finding that the denial of an opportunity for overtime for one day does not constitute an adverse employment action because the plaintiff had other overtime opportunities).  But Gale cites more than the loss of opportunity for overtime; he also argues that the instructor

14

position is "a prestigious assignment," ECF No. 34 at 25, and has submitted evidence that the

removal from the instructor position put his POST certifications in jeopardy because renewal

requires that an applicant teach at least one class in that subject matter each year, *id.* at 26. Thus,

when the record is construed in the light most favorable to Gale, a reasonable juror could find

that his termination as an instructor constituted an adverse employment action because he lost "a

prestigious assignment" and was placed at risk of losing his POST certifications, thereby

jeopardizing his ability to serve as an instructor at all.

2. <u>Inference of Discriminatory Intent</u>

Gale's *prima facie* case falters, however, on the requirement that he point to

circumstances raising an inference of discriminatory intent. A plaintiff may raise an inference of

discriminatory intent by pointing to "evidence of discriminatory statements, but only when a

plaintiff demonstrates that a nexus exists between them and a defendant's [adverse employment]

decision." *Stepheny*, 356 F. Supp. 2d at 259. A plaintiff may also submit evidence that the

"[defendant] treated plaintiff less favorably than a similarly situated employee outside

[plaintiff's] protected group." *Id.* at 260 (quoting *Mandell v. County of Suffolk,* 316 F.3d 368,

379 (2d Cir.2003) (internal quotations omitted)).

Gale points to no circumstances giving rise to an inference that his treatment by Grice or

anyone else employed by the City was based on his race. There is no evidence in the record of

any discriminatory statements. Gale provides only hearsay evidence, which I may not consider

in this ruling, *see* Fed. R. Civ. P. 56(c), that Grice thought Gale discriminated against black

female officers. [7]   Even if I could consider this hearsay evidence, it still would not raise an

---

[7] Gale testified that he heard from "Captain Blackwell and some others" that "[Grice] had made multiple comments that he thought [Gale] was mishandling black females." ECF No. 33-8 at 4–5.

inference of discrimination because it suggests only that Grice thought Gale held racist views, not that Grice harbored animus against Gale because he was white.  *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (holding that "'[r]acism' is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race" and noting that while a statement suggesting that someone is racist may indicate "unfair dislike," it "does not indicate that the object of the statement is being rejected *because of his race*" (emphasis in original)).  In addition, Gale cannot prove that Grice treated similarly situated employees outside of Gale's protected group differently.  To the contrary, Grice hired white instructors for each position Gale sought.  Finally, none of the other evidence Gale cites raises an inference of racial discrimination either.[8]

I conclude that Gale has failed to raise an inference of discriminatory intent and, thus, failed to make out a *prima facie* case of racial discrimination under Title VII and Conn. Gen. Stat. § 46a-60(b)(1).  Therefore, I grant the City's motion for summary judgment as to the racial discrimination claims.

## B.  Retaliation Under Title VII and Conn. Gen. Stat. § 46a-60(b)(1)

---

[8] Gale made other claims of racial discrimination during his deposition, including Grice's giving what Gale thought to be a less desirable assignment to him as compared to a black officer's assignment, Grice's asking Gale to take schedule adjustments to avoid paying him overtime, Grice's making Gale pay out of pocket for his teaching supplies, Grice's allegedly saying that he "doesn't want to use [Gale]," Grice's allegedly keeping Black Lives Matter and Nation of Islam flags in his office, and Grice's allegedly feeling threatened by Gale's Lieutenant test score and his academy training experience.  ECF No. 33, Material ¶¶ 10–16.  The defendant's opposition brief does not mention any of these alleged acts of racial discrimination and I deem them abandoned.  In addition, many of these alleged acts are based solely on hearsay, which I may not consider in this ruling.  *See* Fed. R. Civ. P. 56(c).  The only other incident that Gale points to in his opposition brief is his allegation that Grice would refer to him as Captain Blackwell's "boy."  ECF No. 33, Material ¶ 9.  According to Gale's opposition brief, Captain Blackwell is "African American."  ECF No. 34 at 2.  Gale's knowledge of Grice's comment is based solely on hearsay—he admits in his deposition that he has "not directly heard that testimony from [Grice]."  ECF No. 33-8 at 13 (responding to the question, "Did you ever hear Jeff Grice ever say, 'That's your boy,' quote, unquote, referring to you?").  Even if I could consider this evidence, calling Gale Captain Blackwell's "boy" does not raise an inference of discriminatory intent alone or in conjunction with the Grice's alleged perception of Gale as racist.  Gale admits in his deposition that he does not see any racial connotation in that phrase.  ECF No. 33-8 at 15.

16

Gale alleges that Captain Garcia retaliated against him because of the 2017 CHRO complaint,[9] ECF No. 34 at 39, in three ways: (1) "Captain Garcia shut down all discussions about [Gale's] return [as an instructor], citing his CHRO complaint as the reason," *id.* at 41–42; (2) Captain Garcia "had [Gale] removed from the [FTU]," *id.* at 42; and (3) "the discipline action that Captain Garcia threatened to impose on [Gale]" would have resulted in "disqualification from all instructor activity for a period of six months," *id.* at 43.

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  A retaliation claim under Title VII is analyzed using the *McDonnell Douglas* burden-shifting framework.  *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015).  First, the plaintiff must establish a *prima facie* case of unlawful retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Id.* at 315–16.  The plaintiff's burden for the *prima facie* case is "de minimis, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted).  "If the plaintiff sustains this initial burden, a presumption of retaliation arises" and "[t]he defendant must then

---

[9] In Gale's opposition brief, he states that "CHRO and EEOC complaints [were] filed … on June 6, 2017." ECF No. 34 at 39.  The parties' Local Rule 56(a) statements make no mention of an EEOC complaint, *see* ECF No. 33, and neither party has provided a copy of such a complaint.  Gale's complaint includes a copy of the "Dismissal and Notice of Rights" from the EEOC but not the complaint.  ECF No. 1 at 21.  It does not change the retaliation analysis, but I will refer only to the CHRO complaint.

articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal

quotation marks and citation omitted).   Should the defendant provide such a reason, then the

presumption of retaliation "drops from the picture" and the plaintiff must prove that the "non-

retaliatory reason is a mere pretext for retaliation." *Zann Kwan*, 737 F.3d at 845.  Specifically,

the plaintiff must "show that the retaliation was a 'but-for' cause of the adverse action, and not

simply a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (quoting *Univ. of

Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013).  "'[B]ut-for causation does not

require proof that retaliation was the only cause of the employer's action, but only that the

adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846.

The City argues that Gale fails to make out a *prima facie* case of retaliation because he

fails to show that Captain Garcia's actions amount to adverse employment actions and because

he cannot prove that the decision not to use him to provide training was causally connected to the

filing of the CHRO complaint.  ECF No. 24-1 at 14.  Even if Gale does establish a *prima facie*

case, the City argues, the BPD used other instructors because of financial considerations and

Gale's "disruptive and negative attitude," not to retaliate against him.  *Id.* at 15.

1.  <u>Prima Face Case of Retaliation</u>

The City does not contest that Gale has fulfilled the first two steps for a *prima facie* case.

In any event, Gale's filing of a CHRO complaint qualifies as protected, and Captain Garcia knew

about the CHRO complaint at the latest by August 24, 2017 from Gale's email, which mentioned

it.

The third step for a *prima facie* case is the requirement for an adverse employment

action.  "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous';

anti-retaliation protection is broader and 'extends beyond workplace-related or employment-

related retaliatory acts and harm.'" *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern & Santa Fe. Ry. v. White*, 548 U.S. 53, 67 (2006)).  For a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which … means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal quotation marks and citation omitted).  "Actions that are 'trivial harms' – *i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience' – are not materially adverse." *Tepperwien v. Entergy Nuclear Operations*, 663 F.3d at 568 (quoting *Burlington Northern*, 548 U.S. at 68).  In determining whether an action is materially adverse, "[c]ontext matters, as some actions take on more or less significance depending on the context."  *Id.* at 568 (internal quotation marks omitted).  "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Id.*

The final step for a *prima facie* case is to show a causal connection between the protected activity and the adverse action.  "A causal connection of retaliation can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant.'"  *Wallen v. Teknavo Grp.*, No. 12-6196, 2019 WL 1435879, at *21 (E.D.N.Y. Mar. 30, 2019) (quoting *Littlejohn*, 795 F.3d at 307, 319).

I will address the *prima face* case requirements for each alleged retaliatory action in turn.

     a.  *Garcia's Refusal to Consider Gale for Instructor Assignments*

Gale argues that the first materially adverse action is Captain Garcia's refusal to consider him for future instructor positions at the Academy.  ECF No. 34 at 41–42.  Gale claims that Captain Garcia's September 13, 2017 email "shut down all discussions about [his] return" to the Academy.  *Id.*  The City disputes Gale's interpretation of the email and argues that since "Gale's CHRO allegations did not concern [Captain Garcia], [she] did not want to be dragged into discussing them."  ECF No. 24-3 at 136.  Captain Garcia does not indicate whether she stopped considering him for any instructor positions, but there is evidence in the record that she did, because she did not use him as an instructor at all during her tenure as Commander.  ECF No. 33-9 at 2.  As a result, Gale did not receive the benefits of an instructor position, such as overtime pay.  Although the City disputes Gale's interpretation of Captain Garcia's email, the email's reference to the CHRO complaint, taken together with the fact that Captain Garcia never hired Gale to teach, are enough to allow a reasonable juror to find both an adverse employment action and causation.  From Gale's perspective, Captain Garcia cited his pending CHRO complaint against Grice as the reason for her deciding not to consider him for any instructor positions.  From Captain Garcia's perspective, she thought that Gale was asking her to help him resolve his pending CHRO matter.  ECF No. 24-1 at 12–13.  Both readings of the email are plausible, and thus a reasonable juror could find that Captain Garcia did not consider Gale for teaching assignments—which cost him overtime pay and prestige and jeopardized his POST certifications—because of his filing of the CHRO complaint.  I must thus deny the City's motion for summary judgment on this issue.

> b. *Gale's Termination from the FTU Position*

Gale's termination from the FTU instructor position is also materially adverse.  His termination is accompanied by the loss of overtime he would have made as an instructor.  *See*

*O'Bar v. Borough of Naugatuck*, 260 F.Supp.2d 514, 517 (D. Conn. 2003) (finding that the jury could have found that the removal of a police officer from teaching a program, in addition to other employer actions, formed an adverse employment action because "she would no longer be paid the amount of overtime she had been paid to teach").

As for causal connection, this termination occurred about ten months after Gale's June 6, 2017 filing of his first CHRO complaint.  Officer Garcia informed Gale on April 26, 2018 that he could no longer work as a firearms instructor at the FTU.  ECF No. 33-3 at 8.  Ten months is attenuated but because Gale alleges a "string of retaliatory incidents over the course of [a] year, … it would not be unreasonable for a fact-finder to view the later incidents as temporally related to the CHRO complaint, even though the timing of any single one of the later incidents, viewed in isolation, might not reasonably permit an inference of causation."  *Martinez v. Conn. Dep't of Corrections*, 125 F.Supp.3d 397, 424 (D. Conn. 2015).

Gale raises triable issues of fact concerning his *prima face* case for his termination from the FTU instructor position.

### c.   Garcia's Initiation of Disciplinary Actions Against Gale

Gale's final allegation of retaliatory action is that Captain Garcia "falsely claimed that [Gale] had violated" the Specialized Training Directive.  ECF No. 34 at 44.  Captain Garcia recommended that "Gale not be utilized within a training capacity for a minimum of six months from the date decision is rendered."  ECF No. 24-3 at 77.  Gale denies violating the Directive at all, arguing that he "did not submit himself for a training class with an outside agency," but was instead inquiring about availability of spots and planned to ask Captain Garcia's permission to attend after inquiring.  ECF No. 34 at 44.

When an "employer merely enforces its preexisting disciplinary policies in a reasonable manner," "an employee does not suffer a materially adverse change in the terms of conditions of employment." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir. 2006)).  "The relevant question is … whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment." *Id.* (quoting *Joseph*, 465 F.3d at 92 n.1).  Further, when an employer imposes a disciplinary action, it does not matter whether the employer "reached a correct conclusion," but, rather, whether "the employer made a good faith business determination." *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F.Supp.2d 98, 111 (S.D.N.Y. 2009) (citation omitted) (finding that "in the absence of evidence undermining [the employer's] assertion that it believed in good faith that [the employee's] conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, [the employer] is entitled to summary judgment"); *see also Gilman v. Runyon*, 865 F.Supp. 188, 193 (S.D.N.Y. 1994) (stating that fact finder should not "assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were not taken for a discriminatory reason").

The discipline here began with Captain Garcia's counseling Gale by emailing him to inform him of his alleged infraction.  But counseling alone is not an adverse employment action. *See Tepperwien*, 663 F.3d at 570 (in a retaliation case, finding that counseling an employee was not a material adverse action because it was rescinded, it did not place the employee in "an active disciplinary process," context indicated that the counseling memo contained "criticism … necessary to allow employees to develop, improve and avoid discipline," and the employee was not the only officer counseled for this issue); *Harper v. Brooklyn Children's Ctr.*, No. 12-4545,

2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014) (finding that no reasonable jury could

conclude, without more, that two disciplinary citations and a counseling memorandum

addressing an employee's error constituted a materially adverse action for the purposes of a

retaliation claim).   To be sure, Captain Garcia pursued additional disciplinary action by

submitting a PC-1 on May 11, 2018, in which she recommended that he be barred from teaching

"for a minimum of six months."  But that disciplinary action was dismissed as "double jeopardy"

because Captain Garcia had already counseled Gale in the prior email.[10]  ECF No. 33, Material ¶

105.

       I find that Captain Garcia's counseling email and submission of the PC-1 do not

constitute an adverse employment action.  As noted, counseling is insufficient, and while the PC-

1 carried a threat of discipline, it was dismissed and no punishment was imposed.  *See Yerdon v.*

*Henry*, 91 F.3d 370, 378 (2d Cir. 1996) (upholding district court's finding that the filing of

disciplinary charges against an employee was not adverse action where the charges had not been

adjudicated); *Bowen-Hooks v. City of New York*, 13 F.Supp.3d 179, 212 (E.D.N.Y. 2014) ("A

mere threat of discipline is not an adverse employment action."); *Uddin v. City of New York*, 427

F.Supp.2d 414, 429 (S.D.N.Y. 2006) ("[C]ourts in this circuit have found that reprimands,

threats of disciplinary action and excessive scrutiny do not constitute adverse employment

actions in the absence of other negative results such as a decrease in pay or being placed on

probation.").  Gale has pointed to no evidence in the record suggesting he suffered any harm as a

result of Captain Garcia's submission of the PC-1.  *See Rivera v. Rochester Genesee Reg'l*

---

[10] Neither party has provided a copy of any policy indicating that an employee may be disciplined only once or that counseling in this matter qualified as discipline.  The only description of the policy as applied to Captain Garcia's actions comes from Gale's deposition describing the result of the PC-1.  ECF No. 33-8 at 43–44.

*Transp. Auth.*, 743 F.3d 11, 24–25 (2d Cir. 2014) ("The requirement of a materially adverse employment action reflects the principle that Title VII does not protect an employee from all retaliation, but only retaliation that produces an injury or harm." (internal quotation marks and citation omitted)).  Therefore, I grant the City's motion for summary judgment as to the retaliation claim concerning Captain Garcia's disciplinary actions against Gale.

2.   <u>Legitimate, Non-Retaliatory Reason</u>

The City offers multiple non-retaliatory reasons for its actions.  It states that "the decision not to use [Gale] as an instructor was made due to either budgetary concerns, [Gale's] negative attitude, or the combination of the two."  ECF No. 24-1 at 15.  Specifically, Captain Garcia avers that "[she] felt 'Lieutenant Gale' would not be a good fit" based on his "unprofessional" email on August 24, 2017 and his interaction with her at the Department's gas pump.  ECF No. 24-3 at 136.  Further, the instructors from other police departments for the FTU work at no cost to the BPD.  ECF No. 33, Material ¶ 83.

3.   <u>Retaliatory Motive</u>

Because the City of Bridgeport has offered legitimate, non-retaliatory reasons for its actions, the burden shifts back to Gale to demonstrate that there was retaliatory motive.  Gale argues that reasons of budgetary concerns or his negative attitudes were never raised prior to the filing of this lawsuit, "not in [Captain Gale's] response [] filed with the CHRO, or in her deposition testimony."  ECF No. 34 at 50.  In Captain Garcia's response to Gale's 2018 CHRO complaint, she wrote that she "was concerned … about using Lt. Gale as an instructor because of his behavior" and that her concerns were partially detailed in the PC-1.  ECF No. 33-5 at 4.  Gale points out that the events leading to the PC-1 happened months after Captain Garcia's September

13, 2017 email in which Gale alleges that she "shut down" conversations about his return to the Academy.  ECF No. 34 at 52.  In this lawsuit, the City cites financial reasons and refers to Captain Garcia's affidavit and testimony about Gale's behavior.  *See* ECF No. 24 at 12–15.  Gale argues that these are "post-hoc" justifications indicating retaliatory motive.  ECF No. 34 at 50.

For the last step in the burden-shifting framework, "the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action."  *Rasmy*, 952 F.3d at 392.  The but-for requirement "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in absence of the retaliatory motive."  *Zann Kwan*, 737 F,3d at 846.  "Temporal proximity alone is not sufficient to defeat summary judgment at the pretext stage."  *Id.* at 847.  "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment."  *Id.*  "[T]he question of what motivated an employer[] … is a quintessential jury function."  *Rasmy*, 952 F.3d at 392

Together with the evidence comprising the *prima facie* case, Gale has introduced enough evidence to allow a reasonable juror to find retaliatory motive.  Captain Garcia's September 13, 2017 email was sent only three months after he filed the first CHRO complaint and, as noted above, that email itself could reasonably be read to suggest retaliatory intent.  The FTU termination was some ten months after the CHRO complaint but it was the second of two adverse employment actions involving Captain Garcia.  Finally, Gale has raised a triable issue of fact concerning whether the City's justifications offered in its brief in support of summary judgment amount to a shift from its earlier expressed rationale—which also suggests retaliatory intent.  *See Zann Kwan*, 737 F.3d at 846 (noting that the employer offered "shifting and

somewhat inconsistent explanations for [the employee's] termination" and finding that "[f]rom

such discrepancies a reasonable juror could infer that the explanations given by [the employer]

were pretextual" (citation omitted)).

Because Gale has raised triable issues of fact concerning his retaliation claims, I deny the

City's motion for summary judgment as to these claims, except with respect to the claim

concerning discipline.

## VI.    CONCLUSION

For the reasons above, I GRANT IN PART and DENY IN PART the motion for

summary judgment.


IT IS SO ORDERED.


                                            _____/s/_____
                                            Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                September 30, 2021